

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 8, 2023

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

    Re:    *United States v. Sady Ribeiro*, S3 21 Cr. 530 (SHS)

Dear Judge Stein:

    The defendant in the above-captioned case is scheduled to be sentenced on March 23, 2023, at 2:30 p.m. The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's sentencing memorandum, dated February 13, 2023 ("Def. Mem.").

    Motivated by a desire for easy cash, the defendant (a pain management physician) knowingly performed medically unnecessary surgeries on scores of individuals (many of whom were destitute) as part of a massive trip-and-fall scheme (the "Fraud Scheme" or "Scheme"). The defendant engaged in this conduct for *five years*, across two different conspiracies. And he earned hundreds of thousands of dollars, profiting quite literally off the backs of other, less fortunate people.

    For the reasons set forth below, the Government submits that a substantial term of imprisonment, and one within the Stipulated United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") of 70 to 87 months' imprisonment, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

**Background**

**I.    Offense Conduct**

    A.  <u>Overview of the Fraud Scheme</u>

    From at least 2013 through 2018, the defendant and his co-conspirators participated in a massive Fraud Scheme in which hundreds of individuals staged trip-and-fall accidents and filed fraudulent lawsuits arising from the staged accidents, in which they falsely claimed, among other things, they were seriously injured in the accidents. Certain Fraud Scheme participants, often referred to as "Runners," recruited individuals (the "Patients") to stage or falsely claim to have

suffered trip-and-fall accidents at particular locations throughout the New York City area (the "Accident Sites"). In the course of the Fraud Scheme, Runners, which included Kerry Gordon, Bryan Duncan, Robert Locust, Reginald Dewitt, and Ryan Rainford, among others, recruited nearly 500 Patients. *See* GX-1702.[1]

Common Accident Sites used during the Fraud Scheme included cellar doors, cracks in concrete sidewalks, and purported "potholes" (the "Accident Sites"). In the beginning of the Fraud Scheme, Runners would instruct Patients to claim they had tripped and fallen at a particular location, when in fact the Patients had suffered no such accident. Eventually, Runners began to instruct Patients to stage trip-and-fall accidents, *i.e.*, to go to a location and deliberately fall. The reason for this change was to ensure that the Patients would be transported to the hospital via ambulance and obtain ambulance reports, thereby making their fake accidents appear more legitimate. As described below, Patients recruited into the Scheme were often extremely poor—individuals desperate enough to undergo medically unnecessary surgeries in exchange for small post-surgery payments.

After the Patients staged their trip-and-fall accidents, or falsely claimed to have suffered such accidents, the Runners referred the Patients to one of several lawyers (the "Lawyers"), including George Constantine and Marc Elefant. The Lawyers commenced personal injury lawsuits (the "Fraudulent Lawsuits") against the property owners of the Accident Sites and/or the property owners' insurers (collectively, the "Victims"). The Fraudulent Lawsuits did not disclose that the Patients had either deliberately fallen or never fallen at the Accident Sites, or that they were not seriously injured. Instead, the Fraudulent Lawsuits claimed that the Patients' had serious injuries resulting from the falls that were solely caused by the negligence of the owners of the Accident Sites (*i.e.*, the Victims). The Fraud Scheme participants instructed the Patients to claim that they sustained injuries to particular areas of their bodies, including the knees, shoulders, and/or back—body parts that, if injured, reap high recoveries in personal injury lawsuits.

Members of the Fraud Scheme referred the Patients to particular MRI facilities, including an MRI facility owned by Adrian Alexander, as well as to certain doctors, including Andrew Dowd and the defendant. The defendant and Dowd invariably recommended that the Patients undergo surgery, irrespective of any medical need. To obtain MRI referrals, and to substantiate their Fraudulent Lawsuits, the Patients were instructed to receive ongoing treatment from a chiropractor. In addition, Fraud Scheme participants encouraged Patients to attend physical therapy sessions to create the appearance of serious bodily injury. For example, in a March 2015 email, Duncan, one of the Fraud Scheme's main participants, explained to Alexander that having Patients attend physical therapy sessions was necessary "when it comes to painting a picture of the client being hurt."

Patients were informed that if they intended to continue with their Fraudulent Lawsuits, they would need to undergo surgeries to increase the value of the Fraudulent Lawsuits. The medical procedures included discectomies; spinal fusions; knee and shoulder surgeries; and non-surgical epidural injections. As an incentive to undergo these surgeries, the defendants and their

---

[1] "Tr." refers to the transcript of the trial in this matter, which commenced on November 28, 2022; "GX" refers to Government exhibits from the November 28 trial.

co-conspirators usually arranged for payments, in the form of loans, to be made to the Patients each time they had surgery — typically between $1,000 and $1,500 per surgery ("Post-Surgery Payments").

The defendant and Dowd, who were the primary doctors in the Fraud Scheme, conducted these surgeries regardless of the legitimate medical needs of the Patients. Both the defendant and Dowd paid kickbacks to Fraud Scheme participants who referred Patients to them, in violation of their ethical duties as licensed medical doctors.

The Patients who were recruited into the Fraud Scheme were typically poor — individuals desperate enough to submit to surgeries in exchange for the small Post-Surgery Payments. As much as 40% of the Patients were from homeless shelters in New York City. It was also common for Patients to ask for food or money when they would appear for their intake meetings with the Lawyers. Many of the Patients struggled with maintaining basic hygiene or controlling addictions, and often smelled of alcohol and/or marijuana. Because most Patients did not have the means to pay for transportation, members of the Fraud Scheme transported the Patients to their various medical and legal appointments. Runners, who were also responsible for Patient transportation throughout the Fraud Scheme, frequently dropped off carloads of Patients at a time at these appointments.

In addition to the Post-Surgery Payments, the Patients were induced to participate in the Fraud Scheme by promises that they would receive a percentage of any settlement payments from their Fraudulent Lawsuits. The Patients' medical fees were invariably paid for by litigation funding companies (the "Funding Companies"), including a funding company owned by Alexander, even if the Patient maintained medical coverage through an insurance company or a government-subsidized program. In exchange for funding Patients' medical and legal costs, the Funding Companies charged the Patients high compounding interest rates, sometimes up to 50% on medical loans and up to 100% on personal loans. The interest rates were so high that oftentimes most of the proceeds that were awarded in the Fraudulent Lawsuits were paid to the Funding Companies, Lawyers, doctors, and Fraud Scheme organizers, with the Patients receiving a much smaller percentage of the remaining recovery.

In or about 2015, certain members of the Fraud Scheme split from the original conspiracy and formed a separate conspiracy that operated in substantially the same manner. Specifically, Kalkanis, one of the leaders of the Fraud Scheme, had a falling out with Alexander and Constantine, and split off from the group to form a new conspiracy. The defendant and Dowd joined Kalkanis in the second conspiracy but continued to work with Constantine and Alexander on existing cases as part of the first conspiracy. The defendant also took on new Patients as part of the first conspiracy. Elefant was enlisted as the primary lawyer for the second conspiracy.

B. The Defendant's Role in the Fraud Scheme

Up until the time of his arrest, the defendant was a pain management specialist who focused on treating the lower back. The defendant was brought into the first conspiracy by Kalkanis in approximately 2013. In their initial conversations, Kalkanis explained that, in order for the Fraudulent Cases to be valuable, Patients needed to undergo more invasive procedures, such as discectomies. Kalkanis wanted the defendant to perform those surgeries.

At first, the defendant expressed reservations about the Scheme. For example, in a December 2012 email to Kalkanis, the defendant said, "It is very difficult to offer (and justify if needed) a discectomy in patient with bulging disc, mainly when there are multiple bulging in the MRI. Bulge disc is a very common finding even in normal people. It is easy to make a case for epidural injection but [not] a discectomy." The defendant acknowledged that surgeries were necessary for the Fraudulent Lawsuits to be successful ("I understand that the funding person only makes money when there is surgery"), and encouraged Kalkanis to find another, "more aggressive" doctor to perform discectomies. However, the defendant's reluctance was short-lived; he quickly agreed to join the Scheme.

In 2015, when Alexander and Constantine split from Kalkanis, the defendant continued his participation in the first conspiracy with Kalkanis, and he also joined the second conspiracy involving, among others, Constantine, Gordon, and Duncan.

To increase patient volume (and generate additional profits), the defendant paid Runners (including Gordon and Duncan) kickbacks for each Patient that they brought to him. These cash kickbacks were typically between $1,500 and $2,000 for each patient. The Runners frequently brought carloads of Patients to the defendant.

The defendant invariably performed the exact same "treatments" on each Patient. First, he would conduct a short, perfunctory "examination." Gordon, who was present for many of those "examinations," recalled that the defendant would do most of the talking and did not touch or manipulate Patients' body parts. Surgery was a forgone conclusion. Second, the defendant prepared a report that justified further "treatment," in order to increase the value of the Fraudulent Lawsuits. The defendant explained this in a November 2015 email to Alexander: "I will play honest 'game' with you. . . . I see the patient and generate a very good dictation that justifies the treatment – there is a cost for that and I hope a profit." Third, the defendant preformed the same types of procedures on almost all patients—a lumbar epidural steroid injection followed by a discectomy.

In total, the defendant "treated" approximately 247 Patients (GX-1702), most of whom had medically unnecessary surgeries. He received between $9,500 and $13,500 per procedure.

During his participation in the Fraud Scheme, the defendant became concerned about the blatant fraudulent nature of some of the cases. For example, in an April 2015 email, the defendant wrote to Alexander, Gordon, and Duncan, stating in sum and substance that he had received an email from Alexander asking about two Recruited Patients who had not complained about back pain when they first went to the emergency room, but then when they went to a doctor's appointment with the defendant as part of the Scheme, they did complain about back pain. The defendant stated in all caps at the end of the email that they should only bring him patients that had initially complained of neck or back pain. In other words, recognizing the fraudulent nature of the Scheme, the defendant wanted to make sure there was a good paper trail to cover up the Scheme, and make it appear as though the Recruited Patients had legitimate injuries.

In an email chain in November 2015 from the defendant to Gordon and Duncan, the defendant told Gordon and Duncan that he was afraid that the Recruited Patients were getting too

many surgical procedures done, and that in his experience, these additional procedures would only be required for around 20% of patients, as opposed to all of them (as was occurring in the Scheme). In other words, the Recruited Patients were receiving medically unnecessary procedures in such large numbers that the Scheme might be exposed. The defendant nonetheless continued to participate in the Scheme.

In emails with Fraud Scheme participants, the defendant frequently directed co-conspirators to delete communications in an effort to conceal his knowing participation in the Scheme.

## II.   Procedural History

Superseding Information S3 21 Cr. 530 (SHS) (the "Information") was filed on September 29, 2022, charging the defendant with two counts.  Count One charged the defendant with participating in a mail fraud conspiracy from in or about 2013 to 2018, in violation of 18 U.S.C. § 371, for his role in the first conspiracy.  Count Two charged the defendant with participating in a wire fraud conspiracy from in or about 2015 to April 2018, in violation of 18 U.S.C. § 371, for his role in the second conspiracy.  On September 29, 2022, the defendant pled guilty to the Information with the benefit of a plea agreement.

The Probation Office calculated the applicable Guidelines in the same manner as set forth in the parties' plea agreement.  The offense calculation for the defendant is as follows:

**Base Offense Level:**  Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is six.  Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), 16 points are added because the gain was greater than $1,500,000, but less than $3,500,000.

**10 or more Victims:** Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two points are added because the offense involved ten or more victims.

**Conscious/Reckless Risk of Death or Serious Bodily Injury**: Pursuant to U.S.S.G. § 2B1.1(b)(16)(A), two points are added because the offense involved the conscious or reckless risk of death or serious bodily injury.

**Vulnerable Victims:** Pursuant to U.S.S.G. § 3A1.1(b)(1), two points are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim.

**Special Skill:** Pursuant to U.S.S.G. § 3A1.1(b)(1), a two-level increase is warranted because the defendant knew or should have known that a victim of the offense was a vulnerable victim.

**Acceptance of Responsibility**:  Pursuant to U.S.S.G. §§ 3E.1.1(a) and (b), a three-level reduction is warranted because the defendant has clearly demonstrated acceptance of responsibility.

The defendant is assigned to Criminal History Category I.  (PSR ¶ 62).  Accordingly, as stipulated in the parties' plea agreement, the applicable Guidelines range is 70 to 87 months' imprisonment.  (PSR ¶ 122).  The Probation Office recommends a sentence of 48 months' imprisonment.  (PSR at 41).

## Discussion

As set forth above, the defendant was a critical member of the Fraud Scheme. The defendant performed scores of unnecessary surgeries, needlessly subjecting the Patients to the risk of serious bodily injury, to line his own pockets. And the defendant did this for five years. A substantial term of imprisonment, and one within the Stipulated Guidelines Range of 70 to 87 months' imprisonment, is warranted and necessary here based on the sentencing factors the Court must consider under 18 U.S.C. § 3553(a).

*First*, a sentence within the Stipulated Guidelines Range of 70 to 87 months' is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

The defendant's criminal conduct in this case was abhorrent. Ribeiro and his conspirators preyed on patients who were so desperate for quick cash that they would undergo multiple unnecessary surgeries in exchange for the small Post-Surgery Payments of $1,000-$1,500. For a period of *five years*, the defendant and his conspirators exploited these vulnerable members of society, such as drug addicts and the homeless, for personal gain.

The defendant played a central role in the Scheme: performing unnecessary surgeries and medical procedures. As the defendant acknowledged in email correspondence before joining the first conspiracy, the Scheme Participants would "only make[] money when there is surgery." The defendant knew his vital role in this Scheme from the beginning. He accepted and embraced it.

The surgeries and medical procedures had the potential to cause grave harm to the Patients. In his sentencing submission, the defendant downplays the dangers associated with surgery.[2] The defendant now describes discectomies as "minimally invasive procedures," and claims that "the risk associated with them is minimal and is in no way comparable to that of surgery or operation." (Def. Mem. 17). And during his plea allocution, the defendant claimed that "the risk is almost zero." (Ribeiro Plea Tr. 23). This argument not only defies common sense, it also contradicts the defendant's prior assertions, and it was also squarely rejected by the Government's expert witness, Dr. Neil Roth, during the November 2022 trial. When approached by Kalkanis to join the Scheme, the defendant initially resisted because of the risks attendant in performing unnecessary discectomies. In a December 2012 email, claiming to be "very conservative" and always on the "safe side of road," the defendant rejected Kalkanis's proposal to perform discectomies. The defendant explained, "[i]t is very difficult to offer (and justify if needed) a discectomy in patient with bulging disc, mainly when there are multiple bulging in the MRI. Bulge disc is a very common finding even in normal people. It is easy to make a case for epidural injection but a discectomy..." In other words, the defendant recognized that performing surgery for a bulging disc ("a very common finding even in normal people") was not justified given the risk.

---

[2] The defendant objects to the use of the word "surgery." (PSR at 30). This attempt to whitewash the defendant's conduct is undercut by the defendant's prior usage of the word "surgery," to describe the procedures he performed, in dozens of his emails with coconspirators.

At the trial against Ribeiro's co-defendants, the Government's expert, Dr. Roth, agreed. Dr. Roth explained that there are always risks "[e]ven in the most minimally invasive surgical procedures." (Tr. 1088). Dr. Roth went on to explain, "You still have a risk that comes with any time you go under anesthesia, which could cause respirator problems, you could get an infection, you could have pain afterwards that is significant . . . ." Dr. Roth explained that, in addition to the risk of doctor error, which is not insignificant, "there are systemic risks . . . for something like a blood clot[,] which can go into your heart and cause strokes, it can cause a heart attack. So there are plenty of risk that occur with a simple procedure." (Tr. 1088). Dr. Roth testified that surgery is a "stressor" to the body and has the potential to "bring out something that . . . would not normally come out." (Tr. 1089). Even the most minimally invasive procedure is a traumatic event for the body, Dr. Roth testified. (Tr. 1089).

The defendant deliberately chose to ignore those risks. Day in and day out, he performed unnecessary surgeries as part of the Fraud Scheme. The defendant knew the surgeries were unnecessary; he knew they had the potential to harm people, but he did them anyway. In total, the defendant "treated" 247 Patients, the majority of whom had no legitimate injuries.

The defendant was motivated by greed. For each surgery the defendant performed, he received between $9,500 and $13,500 per procedure. While the defendant correctly notes that there were costs associated with the surgeries he performed – including kickbacks to Kalkanis, Gordon, and Duncan – the defendant still made hundreds of thousands of dollars in profit.[3] And while the defendant did not receive a percentage of the Fraudulent Lawsuit recoveries, the payments to him were in anticipation of those recoveries. In other words, the Funding Companies paid Ribeiro on the assumption that they would recover illicit windfalls from property owners and insurers.

The defendant's contention that he was not motivated by money in unpersuasive. (*See* Def. Mem. 16). Contemporaneous emails reflect regular discussions about payment and a profit. The evidence does not support any other explanation for the defendant's conduct. Nor does the defense sentencing submission. To be clear, the defendant appears to have had a very difficult childhood, and he suffers from numerous ailments. The Government is not unsympathetic. But the defendant's unfortunate upbringing and his poor health do not explain his conduct. Based on the defense submission and the many letters from his friends and family, the defendant is able to distinguish right from wrong. Yet, when given the opportunity to join the Fraud Scheme, he knowingly chose wrong over right, for a period of *five years*. And, in exchange, he made a significant profit.

The defendant argues that the Stipulated Guidelines Range "overstate the level of his involvement" and "is unjustly inflated." (Def. Mem. 18, 25). The defendant mainly bases his argument on the contention that "the loss-driven nature of [the Guidelines] has resulted in an unjustly inflated Guidelines calculation." (Def. Mem. 25). This argument misapprehends the defendant's (generous) Guidelines calculation. First, the Stipulated Guidelines Range is not based on loss at all. Rather, the Government agreed to calculate the Offense Level using *gain*, pursuant

---

[3] The agreed-upon forfeiture amount reflects profits from only a portion of the Patients that Ribeiro treated and credits his costs.

to U.S.S.G. App. Note. 3(b). Had the parties and the Probation Office used loss instead of gain, the defendant's Guidelines range would have been significantly higher.[4] Accordingly, the defendant's arguments concerning his visibility into settlement amounts, the disconnect between his fees and settlements, and the cited legal authority have no application here. The Stipulated Guidelines Range accurately captures the defendant's culpability.

*Second*, a sentence within the Stipulated Guidelines Range of 70 to 87 months is necessary to afford adequate deterrence to others and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) – (C). As noted above, the defendant's conduct was very serious—he participated in a fraud scheme for five years that involved tens of millions of dollars in bogus lawsuits and that exploited the most vulnerable members of the New York City community. As this Court has previously noted, these types of schemes are not uncommon. During Bryan Duncan's January 7, 2020 sentencing hearing, the Court observed that "[t]here are a number of these conspiracies out there[,] and I'm concerned about general deterrence, about other people understanding that you'll pay a heavy price if you prey on vulnerable people and subject them to . . . a risk of injury or death." *United States v. Bryan Duncan*, 18 Cr. 289, Dkt. No. 252, 12-13; *see also* 18 Cr. 289, Dkt. No. 250, 19 ("You're not the only guys to figure out that you could take advantage of desperate people and make some money in this way, with false slip-and-falls. So I think general deterrence is a really relevant factor here.") A sentence within the Stipulate Guidelines Range is necessary to deter one of the most pernicious aspects of the Scheme – unnecessary surgeries. Unscrupulous doctors, lawyers, and other licensed professionals must be put on notice that the abuse of their licenses and involvement in schemes like this will cost them their liberty.

The defendant's argument – that a non-incarceratory sentence provides sufficient deterrence – is unpersuasive. To the contrary, such an extreme variance would only serve to embolden would-be fraudsters. As is clear from this case, it is all too easy to do what the defendants did, all too attractive, and all too difficult to detect until the fraud has reached a massive scale. This means that a meaningful sentence is warranted. *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

---

[4] Just using the losses caused by the Patients whom the defendant treated would have resulted in a loss amount many times higher. For example, assuming the defendant treated 222 fraudulent Patients (*see* GX-1702, PSR ¶ 31), and each of those Patients received an average settlement of $150,000 (PSR ¶ 31), the defendant's loss amount would be $33.3 million, resulting in a Guidelines range of 135 to 168 months' imprisonment.

*Third*, the defendant's relative culpability and the need to avoid unwarranted sentencing disparities justifies a sentence within the Stipulated Guidelines Range. As of the date of this submission, three conspirators have been sentenced: Bryan Duncan was sentenced to 72 months' imprisonment (PSR ¶ 15); Ryan Rainford was sentenced to 68 months' imprisonment (PSR ¶ 13); and Robert Locust was 48 months' imprisonment (PSR ¶ 14). The defendant is more culpable than Rainford and Locust, and on similar footing to Bryan Duncan, although slightly less culpable considering Duncan's role as a case manager, the profits he made, his utter failure to accept responsibility, and his obstruction of justice by tampering with a witness on the eve of trial. As Runners who recruited Patients and transported them to various legal and medical appointments, Rainford and Locust played important Roles in the Fraud Scheme. However, as one of the two primary doctors in the Scheme, the defendant's role was more central the Scheme's success. As the testimony at both trials established, and as the defendant has acknowledged, the surgeries and medical procedures were a necessary component to the Scheme's success – in order for all the conspirators to make money, the Fraudulent Lawsuits had to be valuable, and the medical procedures made the lawsuits valuable. While the Runners may have had more involvement in the day-to-day operation of the Scheme, the defendant's role was more significant. Moreover, unlike Runners, who were more fungible, generally unsophisticated, and had no special skills or training, the defendant was a licensed physician who weaponized his medical training and license for unlawful purposes.

Finally, the defendant misapprehends the nature of the plea agreement in arguing that the structuring of the indictment "creates the potential for drastically unequal sentencing outcomes." (Def. Mem. 29). The defendant correctly observes that the defendants, like Ribeiro, who participated in both conspiracies, were charged in multiple counts. The defendant chose to participate in two conspiracies, and he was charged accordingly. To the extent the structuring of the indictment could lead to inequities at sentencing, and the Government submits it could not, it cannot do so here. The defendant pled guilty to the Superseding Information – not the indictment. And the Government's decision to extend a plea agreement with two counts was wholly based on what it believed was the appropriate statutory maximum sentence, when considering the defendant's role and relative culpability.

## Conclusion

The defendant committed an egregious, systematic fraud for five years. In betraying the trust that the public places in doctors, the defendant used his medical license to prey on the most vulnerable members of the community, including the homeless, and subjected them to the very real risk of bodily injury. In light of all of these factors, a substantial term of imprisonment, and one within the Stipulated Guidelines range of 70 to 87 months' imprisonment, is warranted. In addition, the Government respectfully requests that the Court order the defendant to pay $4,655,733 in restitution, and to forfeit $2,400,000 in United States currency, consistent with the plea agreement.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Nicholas Chiuchiolo
Alexandra Rothman
Nicholas Folly
Danielle Kudla
Assistant United States Attorneys
(212) 637-1247

Cc: Defendant (by ECF)